May it please the court, Michael Satras on behalf of the appellant Robert Johnson. It was absurd for the governor to reverse the parole grant to Robert Johnson on the ground that his commitment offense showed that he would present an unreasonable risk if he were virtually a single act of criminality. It occurred 30 years ago. Mr. Johnson was 17 years old at the time. Can I ask two things that I'd like you to address? What is the ex post facto issue? And just a minute. And the other one is with regard to the issue that you're arguing now, there's some suggestion in Irons v. Carey that it makes a difference if a person is convicted of a crime, but it doesn't make a difference if they're convicted of a crime. It's unclear exactly why it would matter. I think just at some point the court realizes it becomes unreasonable to continue to hold a prisoner confined based on his crime when there's been a sustained showing of reform and rehabilitation. But why would that be the minimum term? This is a 25-year-to-life term? This is a seven-year-to-life term. And that's because of the timing? Why is that? That's because of the time he committed the crime and the law that applied at that time. I see. Because for a short time, until what, 78 or something, when was the change? The change was, I believe it was in 78, a year or two. So this was a pre-78 crime. Right. And it was pursuant to a philosophy that provided that no matter what crime, how egregious the crime was, a prisoner could not be, should be entitled to a determination of whether he'd reformed and rehabilitated after seven years, that that was enough time. No prisoner should be kind of automatically excluded from parole. But the problem is that the California Supreme Court has now told us, no, that isn't the scheme, essentially. I mean, isn't what Dannenberg is telling us, and this is why I have a hard time reconciling Dannenberg and Biggs. I mean, isn't Dannenberg basically saying, no, no, no, that isn't the scheme? You're misunderstanding it. The scheme is that as long as the elements of the crime are more than the minimum for whatever the crime is, and that's a question which you haven't really raised here, as long as that's the case, then the parole board and the governor don't have to let the guy out. Isn't that what we're being told? No. Dannenberg says that there has to be a reasonable basis for the authority to conclude that the prisoner presents a non-reasonable crime. But it doesn't have to be something other than the crime itself. Well, there has to be some showing that that crime indicates that the prisoner presents a continuing risk, that he's a risk at that time. There must be some showing that the crime does that. And certainly, if the crime was nothing more than the minimum elements of the offense, that would be as absurd and arbitrary and capricious as you can get. But Dannenberg also says the parole suitability determination, which is different than the punishment, is based in large part on the defendant's post-conviction record. And that was, of course, historically in California. The law, the purpose, the premise of the indeterminate sentence is it holds out a promise to the individual that despite the gravity of your crime, you can show by virtue of diligence and reform and rehabilitation that you're a changed person. And based on that change, that you can then be released. It holds out a hope to the prisoner for that. And certainly when you look at this Court's past decisions that said, well, we're going to at least require the prisoner to serve his minimum term of actual years before we conclude that this has gotten to the point of unreasonableness or irrationality, it is important in this case to consider that Mr. Johnson is way, way, way beyond those seven years. Four times that, now 30 years. And that the term for punishment purposes that were ascribed under the statute and implementing rules and regulations for him to assess the gravity of the crime and the punishment resulted in a parole release date for him of January 1990. More than 15 years ago. And he is being held now not for punishment purposes, supposedly, not because of, you know, this is necessary to exact the punishment for this kind of behavior, but solely because of a finding now by the governor that he would present an unreasonable risk if released. And that does go then to your first question, Your Honor, of what are the ex post facto implications of this? The real question is, has anything changed since the original Johnson opinion? And the answer is yes. Garner has been decided. So then my question very specifically is, you know, from the point of view of a three-judge panel like this one, how, I mean, is Garner enough different from, how is Garner different from Morales in the standard it sets that would allow us as a three-judge panel to question Johnson? Right. Well, I think it's illustrated by this Court's decision in Brown v. Pommetier, which is that the ex post facto question, you look at the statute in the abstract and to see if it disadvantages the prisoner, but it's essential that you also look at its practical applications. So you think Garner is the first case that set up this two-prong approach, is that right? Yes, Your Honor. And what it said was that if there is a substantial risk. Significant risk. Significant, thank you. And wasn't that dealt with at length in Rosencrantz? In Rosencrantz, yes, it was. They dealt with the ex post facto issue, and there was a strong dissenting opinion in that case, which is right on, and that we would ask this Court to follow that said on the basis of Garner, it is ex post facto, because look at how it's being applied. The Governor doesn't --" Tell me why the four justices of the Supreme Court of California who were in the majority opinion, including Justice Moreno and Justice Werdegar, who concurred, were wrong in their analysis in Rosencrantz? Because they failed to appreciate that the purpose of giving the Governor the power to review the statute and to do a parole determination for murderers, according to the legislative history or the initiative history, was designed to reverse parole grants. But that's not what the proposition said. Regardless of what you say the purpose was from the arguments of the proponents and the opponents. The proposition 89 specifically said that the Governor had to use the same desiderata in making his determination, as did the parole board. Here was the only person, well, not the only person, there were other constitutional officers, but one of the only persons voted on by everyone in California. Was it unconstitutional to vest that power in the Governor, and if so, why? Well, you can vest that power in the Governor, but it's unconstitutional to apply it retroactively to the parole board. My question is this. In fact, what happened during this time period was two things. I mean, and I guess one of them was that the parole board is now granting parole very, very rarely, or was. I don't know what's true now. It is true. Much more rarely than previously, right? Yes. That was a change, an on-the-ground empirical change, but one that I assume you would agree is not an ex post facto problem. Correct. I mean, there was a change in personnel and a change in directives and so on. There is a due process problem, I think, when the executive kind of increases the punishment, or becomes more restrictive in its parole policies, when the statute. But it wasn't a legislative change. Right. So then, I mean, my problem is really this, that it isn't really so clear that the Governor himself is making much of a difference. Because as I understand the numbers, it's something like there were 48 parole grants out of 4,800. That's where the real change is. And then the Governor then at some point in time, I don't know what point in time, reversed 47 of those 48. So in terms of looking at the overall statistical world, it would seem that what's really making the difference isn't the Governor. Well, it's both of them together. It's a hydra, a monster of arbitrary and capricious implementation of the parole law in arbitrary disregard of the Penal Code, which says parole shall normally be granted to an individual, and only denied in the exceptional case where it can be shown that he would present an unreasonable risk. But Garner says you have to show by the practical application that it in fact disadvantages the case at hand. And Mr. Johnson is at he's part of the cream of the crop in terms of life prisoners who have been able to demonstrate their suitability for parole. Because like Your Honor says, the board rarely grants parole to any prisoner, and they've twice granted it to Mr. Johnson. And the Governor has now twice reversed. So you see the practical application of it. You know, for all intents and purposes, 90 percent, 95 percent of life prisoners are going to be denied parole. But in fact, for those few that are granted, the Governor's power makes all the difference in the world because he's reversing 90 percent. So when you get to 1 percent of 1 percent, the whole system becomes kind of a farce and a sham. And you especially see that in this case because the Governor made no reference or acknowledgment to any of the statutory regulations designed to enact the legislative design, which should have been pertinent in this case. You don't know from the Governor's decision that Mr. Johnson was 17 years old at the time that he had no prior criminal history, that he had no violent juvenile history, that he spent 27 years in prison. He spent 25 years in amazing reform and rehabilitation, being virtually disciplinary free, obtaining vocations, getting good parole plans, continual participation in self-help and therapy, according to the board. And a unanimous conclusion of minimal risk by various staff at the institution, by his counselors, and by every mental health evaluator since 1987. And by the board more than once. Okay. You know, time this up. I'll give you a little time to wrap it up. Thank you very much. Thank you. May it please the Court. Maria Chan, Deputy Attorney General, on behalf of the Respondent Appellee. Mr. Johnson committed a heinous crime, and he showed a total disregard for life and human suffering. The district court decision should be affirmed because the state court decision that considered the merits of Mr. Johnson's constitutional claims properly found that Mr. Johnson's constitutional rights were not violated. That's not really our standard. If it were, frankly, I'd have a lot of trouble with your argument. Our standards are standards. Is that right? Yes, it is. Because I don't really understand what it means to say that somebody's being sentenced to life with possibility of parole, but there's no possibility of parole. And that's essentially what we're being told. Does Mr. Johnson have any possibility of ever getting parole? He has the possibility of parole. And why? What's going to change? His crime is never going to change. His crime will never change, but he will continue to have parole hearings every year. Yes, he will, but on any unless somebody, except on an arbitrary basis, i.e., a change of personnel, the criteria that are being applied are never going to change. That is correct, Your Honor. However, in this case, the governor, the board found him suitable, and the governor reversed, and the governor had reasons to reverse him. It wasn't an arbitrary or capricious decision. And, yes, the governor did rely on the commitment offense, which will never change, but which in this case was a very heinous crime. But that wasn't the only thing that the governor relied on. What else did he rely on? The governor relied on his unstable social history. But on those issues, my recollection is that both the State and the Federal District Court had real problems in terms of some evidence. His unstable social history was his parents, not him, basically. Yes, Your Honor, but the governor under the California regulations is allowed to consider that, and those are the standards that guide the governor's decision. He considered the fact that his father was an alcoholic, and that's his problem, and that's why he should stay in prison for 30 more years? Well, he was also he also had a drinking problem, and he also admits that he was heavily drinking 48 hours before he committed the crime. Thirty years ago. Yes, Your Honor. In addition, the governor did also rely on something that isn't mentioned very much but is very important, and it's the fact that he continues to minimize the nature of his crime. Well, and that also, I mean, as I recall, both the State and the Federal Courts had some real problems, because he was plainly misinterpreting what the man said. The man didn't say, I think it was a game. He said, at the time I was acting, it was a game. Well, the governor took that to mean that he hadn't accepted responsibility, and that is part of what the governor is allowed to do. You can just misread the record? The fact that there may be different interpretations of the record doesn't mean that the governor's interpretation is unreasonable. And under the AEDPA standards, that is what we're looking at. We're looking at the State court's decision. Well, suppose I thought that was unreasonable, and I also thought that these unstable social history was unreasonable, and I was down to only the only thing that I thought could be reasonable was the existing prior crime, then what? Well, at least under clearly established, there is no clearly established Supreme Court precedent that says that the governor may not continue to rely on the crime as a basis to deny him parole, and that is what we're looking for under the AEDPA. The State court, in an extensive reasoned decision, looked at the record, and they determined that this was, in fact, a heinous crime. Mr. Johnson singled out two vulnerable individuals. They went with a plan to kill these people that they didn't even know, and they succeeded. One person is dead. The other person had the good fortune of escaping. The problem is that he wasn't sentenced to life imprisonment without possibility of parole. He was sentenced to life imprisonment, seven years to life with possibility of parole. And it's now, what, 23 years or something past the seven years, and he is, unless we have, simply based on a change of personnel, because the only thing that could change is a different governor, he is never going to get parole. So he was given, the sentence that he was given essentially isn't being carried out. He was given a sentence of life, Your Honor, with the possibility of parole. And that means that he, under Dannenberg, the California Supreme Court case, he can expect to spend life in prison until the executive branch, be it the governor, finds him suitable for parole. And under Dannenberg, the governor can continue to rely on the commitment offense. There's no Federal Supreme Court authority that says that he cannot. So if we look at that and we look at the State court decision that did an extensive analysis of the record and found that the commitment offense in this case was sufficient to sustain the governor's decision, that decision is not unreasonable. And what about the ex post facto issue, i.e., I understand there's a Ninth Circuit opinion and I understand that the California Supreme Court in Rosencrantz went and discussed this at some length. I thought of particular interest was Justice Werdicke's opinion, which essentially said if Garner applies to this, then the ex post facto, then there is an ex post facto problem, but Garner doesn't apply to this. And I didn't understand that. Why does she think Garner doesn't apply to this? Because it was a different circumstance. Under Garner, what was being challenged was extending the yearly parole reviews to three-year parole reviews in certain limited cases. In this case, what we have is we simply have another level of the executive branch making the final decision as to whether this individual is going to be paroled. And there's nothing in the language in Garner that indicates that they would apply the language or the, I guess, the second prong about whether the petitioner can provide evidence to show that this new legislation is being applied to him in a retroactive manner. There's nothing in the Garner language that would suggest that that was meant to extend to anything beyond this change in how often the parole consideration hearings would happen for this particular type of inmate. You would take the mandate of the Supreme Court in Musladin v. Carey and apply it here and say, there is no Supreme Court case that deals with this, including Garner. Absolutely, Your Honor. It's a different set of, a completely different scenario and different set of facts. Where do you find that the Garner statement is limited? I mean, it seemed to me to be a general statement about ex post facto rules cases. I don't have the site, Your Honor, but the language, the statement comes following a discussion of the change in that particular legislation. So there's nothing in Garner to suggest that that would be extended to any other situation. Suppose we disagreed with that. Do you think Justice Roediger is right that if it applies, then there is a sufficient change that would require us to reconsider Johnson, the earlier Johnson case? I disagree, Your Honor. It's not a sufficient change because this is simply another level of review. It's still within the executive branch. Now, I'm saying, is Garner a significant, a sufficient change of the Supreme Court law, if we read it more broadly than you did? In other words, if we thought Garner did apply to this? Not under Musladin. I'm sorry? Not under the case of Musladin, Musladin, because it's a different set of facts. So I don't think that this case is on point to the scenario that we're discussing  There's a completely different legislation. It had different purposes. And like I said, the legislation giving the governor review authority is only adding another level of review to the executive branch that is already in charge of determining when the inmates will be paroled. Yes? Anything else? No. In conclusion Let me ask you what I asked your opponent. What do you make of the suggestion in Irons that there is some, that big somehow pops in at some point, i.e., when the minimum term has been served? Is there any reason why that would make a difference? No, Your Honor. And Irons is pending the petition for rehearing en banc, which has been granted I'm sorry. No, the petition for rehearing en banc is pending. So Irons is not final. But going back to what is clearly established Supreme Court precedent, there's nothing that establishes that there's a minimum term for murder. And also to clarify, the minimum term, for example, in Mr. Johnson's case, he was not sentenced to seven years to life. He was sentenced to life with the possibility of parole. The minimum term or the seven years is the minimum that he could be considered for parole by the board. It doesn't mean he needs to be granted parole at seven years or that that's some kind of standard that. That is the only one. Is that different from the current scheme? In other words, he was literally sentenced to life with the possibility of parole and the seven years was just the parole term? Yes, Your Honor. No. But now, this is something that's confused me all along. Now, as I understand it, second-degree murder is 15 years to life and first-degree murder is 25 years to life. What is that? But people are actually eligible for parole sooner than that. Is that not right? They're eligible for consideration. And it's my understanding under the penal code as it is now, they have to serve a minimum of the 15 years or the 25 years. But they are able to be considered by the board before then. So they can be considered for suitability before counting good time credits and stuff, and there's a lot of different situations and types of credits. But 15 years is the minimum that they have to serve. They can be considered prior to that, 12 years, 11 years, depending on what their credit earning situation is. They can be considered earlier, but they can't be released until 15 years? Exactly. Except for good time credits. Exactly. But his term was a different kind of a term? It was not a ---- He has a life term with the possibility of parole in that he could be considered at seven years, which I'm not sure when was the first time he was considered in this case. But the point being that, no, Irons does not set that standard because Irons is not Supreme Court precedent. In conclusion, Your Honor, Johnson is not entitled to federal habeas relief in this case because the state court decision applying the some evidence standard found that there was evidence on the record in conformance with the California penal code and the regulations to support the governor's decision. Even if the some evidence standard were to be the applicable standard in these types of cases, the state court applied that standard and properly found that Mr. Johnson's ---- Mr. Johnson, the governor properly found Mr. Johnson unsuitable for parole. Thank you very much. Thank you. Thank you. What the board said when it granted Mr. Johnson parole, Commissioner Daly, you have done everything that you can to better yourself while in prison. Commissioner Moore, we think you've done everything pretty much that is possible that you can do here in our system. You've been with us an awful long time. And that goes to the court's point that what the governor has done here is basically replaced the legislative design where a prisoner ---- Okay. It's true. Why is that a constitutional problem? I mean, that's our problem. Because ---- Our basic problem is what ---- I understand there's some language in bigs, but I gather that there would be no constitutional problem with a sentence of life without possibility of parole for this crime, right? If that had been the designated term. Correct. And Dannenberg is sort of telling us that this statute is to be read that way for certain people, in essence, i.e., if the crime is bad enough. Well, I think you always have to look, Dannenberg says, you always have to look within the context of all the pertinent rules and regulations that are in place. I'm not sure it really says that. It seems to be very hard-nosed about the fact ---- And the statute actually does say, with regard to the parole eligibility, to look at the gravity of the crime. That's what it says. The statute says it, right? Right. It doesn't say look at anything else. It just says look at the gravity of the crime. Well, it says to the parole board, and set up rules and regulations designed to look at the gravity of the crime as a way of punishment. Right. But not other things. So why can't ---- I just have a real struggle with this, even though it seems likely to me that this isn't what the Congress intended. I mean, what the legislature intended. But we have the California Supreme Court sort of saying otherwise, saying that this statute is to be read as permitting a permanent disability from parole for certain people, even if they're sentenced with possibility of parole. Only if you look at all the factors of the individual case, which is required by due process, and apply what Dannenberg emphasizes are the detailed regulations that implement the law, which they say is a hedge to protect against arbitrary deprivation of the right to parole. They put a lot of emphasis on the detailed regulations. But certainly the essence of due process is it's the rule of law that controls, not the rule of man. And so if you have a statute that says it's life with the possibility of parole, you cannot have a man come in for his own political or personal reasons and say I'm not going to follow that law, I'm going to deem all murderers or most murderers, as he said publicly, if you murder somebody, you're not getting out from prison ever. I'm giving you life without possibility of parole. The problem is that by coming to a federal court with this, where we have to deal with the fact that we can't interpret state law, it's much more difficult. You understand that. Anyway, thank you very much for your argument. Okay. I want to thank the attorneys for a very good argument.
judges: Berzon, Bea, Gibson